No. 88-414

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

JEFFREY KEVIN O'BRIAN,

    Defendant and Appellant,

vs.

STATE OF MONTANA,

    Plaintiff and Respondent.

APPEAL FROM:  The District Court of the Fourteenth Judicial District,
In and for the County of Musselshell,
The Honorable Roy C. Rodeghiero, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

John L. Pratt; Ask & Pratt, Roundup, Montana

    For Respondent:

Honorable Marc Racicot, Attorney General, Helena, Montana
Paul D. Johnson, Assistant Attorney General, Helena, Montana
Floyd Brower, Musselshell County Attorney, Roundup, Montana
Gerry M. Higgins, Deputy County Attorney, Roundup, Montana

Submitted on Briefs: December 29, 1988

Decided:  February 23, 1989

FILED '89 FEB 23 AM 10 42
ED SMITH, CLERK
MONTANA SUPREME COURT

Filed:

Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

Defendant Jeffrey O'Brian (O'Brian) appeals from the judgment and sentence entered by the Fourteenth Judicial District Court, Musselshell County. Based upon the results of an Intoxilizer test administered to O'Brian, the District Court found him guilty beyond a reasonable doubt of a per se violation of driving a vehicle with a blood alcohol concentration greater than 0.10. We affirm.

The sole issue raised upon appeal is whether the District Court erred in admitting the results of an Intoxilizer 5000 blood alcohol concentration test when the test was allegedly not administered in compliance with requirements of the Administrative Rules of Montana?

Shortly after 2:00 a.m. on May 26, 1987, officer Woodrow Weitzeil stopped O'Brian for failing to dim his lights. The officer requested O'Brian to produce his driver's license and insurance, which O'Brian produced without difficulty. The officer, however, detected the strong odor of alcohol on O'Brian's breath while talking with him. Consequently, the officer requested O'Brian to take several field sobriety tests, including the Horizontal Gaze Nystagmus test and the one-legged stand test. Following these tests, the officer placed O'Brian under arrest for driving under the influence of alcohol (DUI) and drove him to the Musselshell County jail. An Intoxilizer 5000 test was administered at the jail.

Officer Weitzeil, a trained operator of the Intoxilizer 5000 instrument, administered the test. The officer first conducted a calibration check of the instrument by passing a simulator solution through the instrument. The solution had

2

a known concentration of 0.10 grams of alcohol per 210 liters of vapor five to seven months prior to this calibration check. The Intoxilizer 5000 registered an alcohol content in the solution of 0.060. The officer ran an air blank through the instrument to clear all traces of alcohol vapor from it and then requested that O'Brian blow into the instrument. It registered O'Brian's blood alcohol concentration at 0.207 at 2:32 a.m. that morning. The officer conducted another calibration check with the same simulator solution. The solution registered an alcohol content of 0.062 during the second check. An air blast was again run through the instrument and then O'Brian was again tested. This second test of O'Brian, three minutes after the first test, registered a blood alcohol content of 0.187. O'Brian was subsequently charged by amended complaint with operating a motor vehicle with an alcohol concentration of 0.10 or more in violation of § 61-8-406, MCA.

O'Brian was tried on this charge in Justice Court on November 13, 1987. Following a trial and without a determination of guilt, the Justice of the Peace dismissed the criminal charge in the amended complaint for lack of jurisdiction. Among other errors, the Justice of the Peace found that O'Brian had not been arraigned on the amended charge of DUI per se and had not entered a plea to this charge prior to trial. The county then appealed this dismissal to the Fourteenth Judicial District Court of Musselshell County.

On April 7, 1988, the District Court arraigned O'Brian on the DUI per se charge and then proceeded with a nonjury trial, over objections of double jeopardy and lack of a speedy trial by the defense counsel. At the conclusion of

3

the trial, the court held that the Intoxilizer 5000 test was administered in substantial compliance with State statutes and the Administrative Rules of Montana. The court then adjudged the defendant guilty, based solely upon the results of the Intoxilizer 5000 test, of driving with a blood alcohol content of 0.10 or greater in violation of § 61-8-406, MCA. The court ordered O'Brian to pay a $100 fine, to pay for and complete an alcohol treatment program, and to surrender his permanent driver's license. O'Brian appeals from this judgment and sentence.

Appellant contends that officer Weitzeil failed to administer the Intoxilizer 5000 test in compliance with the requirements of the Administrative Rules of Montana. The Rules require a calibration check to fall within a plus or minus one-tenth range of the known alcohol concentration of a reference solution to guarantee the instrument's accuracy prior to admission of the test Yet, in this case, the Intoxilizer 5000 registered the simulator solution at 0.060 and 0.062 just prior to the testing of appellant. These readings do not come within the required plus or minus one-tenth range of the known 0.10 alcohol concentration of the solution. Consequently, the appellant contends the test was not administered in compliance with the Administrative Rules of Montana, the accuracy of the test results were questionable, and the court thus erred in admitting the Intoxilizer 5000 test results into evidence.

At the outset, we note that a criminal defendant charged with driving under the influence of alcohol is indeed entitled to any procedural safeguards in the Administrative Rules of Montana. State v. McDonald (Mont. 1985), 697 P.2d 1328, 1331, 42 St.Rep. 414, 419. Those procedural safeguards

4

which are relevant to this case and which the defendant alleges were violated are found in § 23.4.135(2), ARM (1987):

> (2) The department shall examine and evaluate any breath-testing instrument submitted for its approval. The department may approve the instrument if the instrument meets the following criteria:
>
> . . .
>
> (b) The instrument is capable of analyzing a suitable reference sample, such as air equilibrated with a reference solution of known alcohol content at a known temperature. The results of such analysis must fall within a range defined by plus or minus one-tenth of the alcohol concentration of the reference solution or such other limits set by the department. . .

This Administrative Rule requires only that the Intoxilizer 5000 instrument be capable of analyzing a reference simulator solution within a plus or minus one-tenth range. The Rule does not require a calibration check before each test, although officers routinely ran such a check prior to the testing of each defendant.

The Intoxilizer 5000 instrument used on the defendant had satisfied the requirements of the Administrative Rules prior to its use. Expert witness William Newhouse, a forensic scientist at the Montana Department of Justice's Crime Laboratory in Missoula, testified that the instrument in use at the time of defendant's arrest had been installed in the Musselshell County sheriff's office on June 17, 1986. At that time, a calibration check using a simulator solution with a known alcohol concentration of 0.10, resulted in a 0.102 reading. This reading was well within the permissible

5

one-tenth range of accuracy. Additionally, the officer who administered the test on the defendant was properly trained in the use of the Intoxilizer 5000 test and conducted the test in accordance with such training. We hold that the evidence adduced at trial was sufficient to indicate the proper working condition of the instrument on May 26, 1987 and to ensure the legal sufficiency of the admitted evidence. Expert witness Newhouse testified that a calibration check is not necessary prior to every breath test to ensure the accuracy of an Intoxilizer 5000 instrument. Rather, periodic calibration checks would sufficiently guarantee the proper working condition of the instrument. On October 8, 1987, Joe Stewart, another forensic scientist with the Crime Lab in Missoula, conducted just such a periodic check of the instrument at issue in this case. The Intoxilizer registered the alcohol level of a new simulator solution with a known 0.10 alcohol concentration at 0.098, 0.096, 0.098, and 0.0987, respectively, after four separate calibration checks. Each of these checks indicated the instrument was properly working and calibrating within the instrument's required range of accuracy. Newhouse thus concluded:

> Again, based on our records at the laboratory and the log records, I can tell you, based on my familiarity with this instrument over four years and [with] 65 other instruments, that I can tell that instrument was measuring blood alcohol concentrations on breath tests accurately on May 26, 1987.

Further, the testimony at trial sufficiently explained the reason for the low calibration checks on May 26, 1987 and the lack of effect such low readings would have had on the accuracy of the appellant's breath tests. As Newhouse

testified, the low calibration readings of 0.060 and 0.062 on May 26, 1987 were due to a general decrease in the alcohol concentration of the simulator solution because of its repeated use over the prior four to five month period. The Crime Lab instructed all officers operating the Intoxilizer 5000 to change the simulator solution once a month to prevent this decrease in the solution's alcohol concentration, but the officers failed to do so. Consequently, many calibration checks such as the ones run on May 26, 1987 proved essentially worthless because of the unknown alcohol concentration of the simulator solution. However, these invalid calibration checks had no bearing on the validity of the defendant's breath tests for, as stated by Newhouse, "calibration checks are entirely independent of the breath tests." The low calibration readings thus were not indicative of a faulty instrument, but only of a gradually diminished alcohol content in the simulator solution. We therefore hold that the District Court did not err in holding that the Intoxilizer 5000 test was administered in substantial compliance with the Administrative Rules of Montana.

The evidence introduced at trial indicated probable cause for the arrest, the proper administration of the Intoxilizer test to O'Brian, the proper working condition of the instrument, and the excessive alcohol concentration in the defendant's blood at the time of his arrest in violation of § 61-8-406, MCA. The Intoxilizer 5000 registered the alcohol concentration of O'Brian's breath first at 0.207 and then at 0.187, which when averaged to 0.197 amounts to nearly double the alcohol concentration allowed when driving an automobile upon the public roads in Montana. This

7

concentration indicated O'Brian had been operating his vehicle with an alcohol concentration of 0.10 or more in violation of § 61-8-406, MCA, a statutory provision imposing absolute liability upon a defendant upon proof of such an excessive concentration. The District Court thus did not err in finding the defendant guilty beyond a reasonable doubt of driving while under the influence of alcohol and in then imposing a sentence in accordance with § 61-8-722, MCA.

The judgment and sentence of the District Court are affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

8

Mr. Justice John C. Sheehy, dissenting:

I dissent. This cause should be dismissed because under our statutes the evidence of the breath tests were inadmissible.

Evidence of the results of a breath test for alcohol concentration is admissible if the breath analysis report was prepared and verified by the person who performed the test. Section 61-8-404(b)(i), MCA. The police officer here who prepared the report, being not otherwise divinely equipped, could verify the report only by use of the calibration check of the intoxilyzer. The contention of the State is that we can ignore the erratic results of the calibration check. Under the statute for admissibility, however, the report must not only be prepared by the officer, but verified by him.

The procedure established for police officers to verify the breath test of a DUI suspect is to conduct a calibration check using a reference solution with a known 0.10 alcohol concentration.

The majority admit that the intoxilyzer test of the similator solution produced two results, 0.60 and 0.62, just prior to the testing of the appellant. The readings taken of the appellant show an inaccuracy, registering 0.202 in one instance and three minutes later, 0.187 in another, a variance of at least 7.5 percent, although the intoxilyzer is supposed to be accurate to within plus or minus 5 percent.

We have no way of knowing whether the intoxilyzer was working accurately on May 26, 1987, when O'Brien was tested, because it is impossible to determine from the record the known concentration of the alcohol simulator at the time, which would have verified his test results. The State tries to explain away the inaccuracy of the verification sample by

9

having its witness testify that the alcohol content of the simulator had reduced in the period of time from a known concentration of 0.10 to the recorded concentration on May 26, 1987 of 0.060.  The log belies this argument.  The log of this police officer's tests with the registered calibration checks are as follows:

| Date | Simulator Results | Blood/Alcohol Results |
|------|-------------------|-----------------------|
| 4-16-87 | .073 | .227 |
| 4-21-87 | .078 | .000 |
| 5-9-87 | .063 | .158 |
| 5-17-87 | .066 | .175 |
| 5-17-87 | None | .164 |
| 5-17-87 | None | .170 |
| 5-25-87 | .064 | .219 |
| 5-26-87) O'Brian | .060 | .207 |
| 5-26-87) | .062 | .187 |
| 7-6-87 | .084 | .162 |
| 7-14-87 | .081 | .000 |
| 7-20-87 | .074 | .084 |
| 8-12-87 | .046 | .048 |
| 8-15-87 | .091 | .235 |
| 9-9-87 | .050 | .195 |
| 9-19-87 | .065 | .169 |
| 9-19-87 | .053 | .063 |
| 9-19-87 | .074 | .133 |

The logs shows conclusively that if the intoxilyzer were correctly recording the alcohol concentration in the simulator solution, the alcohol concentration increased rather than decreased following the O'Brian test.  In fact, the check tests of the simulator solution eight days before O'Brian was tested (May 17) showed no alcohol in the simulator solution.  On May 26, for a check of O'Brian, the simulator had increased in alcohol concentration from no alcohol on May 17 to 0.060 in May 26!  In the test checks of the simulator solution in the months following the O'Brian test, on July 6 the intoxilyzer recorded 0.084, an increase of 0.022 in alcohol concentration or a 35.5 percent increase.

10

On August 15, the simulator gave an alcohol concentration result of 0.091, an increase of 46.7 percent from the O'Brian check test. Thus, the State's explanation that as time wore on the alcohol in the simulator solution decreased is belied. The intoxilyzer check tests following O'Brian's tests show the reference simulator _increasing_ and _decreasing_ in alcohol content. Either the intoxilyzer was incorrectly recording the check tests or the reference simulator solution was performing a feat of alchemy, manufacturing and devouring alcohol at will. O'Brian therefore established not only a reasonable doubt as to the accuracy of the tests performed upon him, but a very substantial doubt as to the verification of his tests.

The State Crime Laboratory personnel recognized the problem when the machine was inspected on October 8, 1987. An entry was written by the inspector in the log as follows:

> Annual Inspection of Calibration2/new I86-19/.100 *DO NOT USE THIS INSTRUMENT WHEN THE RESULT OF THE CALIBRATION CHECK IS OVER .110 OR BELOW 0.90. CHANGE SOLUTIONS ONCE PER MONTH AT THE FIRST OF THE MONTH, RECORD THE DATE OF THAT CHANGE IN THE LOG BOOK, AND ALWAYS ALLOW THE SOLUTION TO HEAT UNTIL THE READY LIGHT COMES ON.

The accuracy of the verification tests is important because of the very minute amounts of alcohol being measured through a breath test. To convict a person of DUI under § 61-8-406, MCA, it must be shown that the alcohol concentration in his breath is 0.10 or more. "Alcohol concentration" for breath tests is defined by statute as "grams of alcohol per 210 liters of breath." Section 61-8-407, MCA. This is a weight/volume definition, proportioning the weight of alcohol against a volume of air.

Absolute alcohol has a specific gravity of 0.789. A gram of alcohol will occupy a volume of 1.26 cubic

centimeters. A gram of alcohol is proportional against a breath volume of 210 liters, which equals 55.5 gallons of liquid volume. That proportion is so distended that one can see that a variation of a very small amount in alcohol content will result in wide swings in the resultant alcohol concentration in the same volume of breath.

A cubic centimeter may be considered as the upper top of your little finger distally from the root of the nail. To achieve a 0.10 alcohol concentration sufficient for conviction, approximately 1/8 of the volume of the top of your little finger, or 0.126 cubic centimeters of alcohol must be present in 55.5 gallons of breath. The man with a lung capacity of 55.5 gallons has yet to be born, and so the amount of alcohol to qualify for a 0.10 alcohol concentration in breath must be reduced in that proportion to the amount of alveolar air present in the lungs. It is a tiny amount. There is no doubt that scientists have devised machines such as intoxilyzers which will measure breath alcohol content within a range of plus or minus 10 percent. Machines, however, are not unlike your automobile. Sometimes things go wrong. For that reason, the statute on admissibility of evidence of breath alcohol tests requires <u>verification</u> of the machine's results. Here, verification is lacking.

O'Brien was first stopped in this case because he failed to dim his lights at 2:00 in the morning in Roundup, Montana. He must be truly amazed at what unfolded in connection with his prosecution subsequently. The principal witness relied on by the State was William Newhouse, described by the State as a forensic scientist from the State Crime Laboratory. "Forensic" literally means argumentative. There is no such science as forensics because a forensic is an art and not a science. His educational background is in physics. He has testified in regard to determination of blood alcohol by

breath analysis over 60 times in Montana courts. If his testimony here is an example, he is more of a paid gun than a scientist. His testimony essentially is to the effect that the intoxilyzer was working correctly when the simulator solution was first used and was working correctly on October 8, 1987, when it was inspected by a person from the State Crime Laboratory. His testimony is that we can disregard the erratic results of the simulator solution because the intoxilyzer was recording accurately. What is left out in this testimony, however, is that without a reference simulator of known alcohol content, the tests taken of O'Brian on May 26 have not been verified by the person administering the test. Section 61-8-404(b)(i), MCA. Under the statute, therefore, the results of O'Brian's test should not have been admitted into evidence.

I would reverse the conviction in this case.

_John C. Sheehy_
Justice

I concur with the foregoing dissent.

_William E. Hunt_
Justice

13